UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x

| | | |
|---|---|---|
| USDC SDNY | | |
| DOCUMENT | | |
| ELECTRONICALLY FILED | | |
| DOC #: _____ | | |
| DATE FILED: ___3/2/15_____ | | |

WALTER SINGLETON,                                    :

                  Plaintiff,          :

     - against -                    :

COMMISSIONER OF SOCIAL
SECURITY,                                                   :

              Defendant.          :
---------------------------------------------------------x

**REPORT AND
RECOMMENDATION
TO THE HONORABLE
<u>PAUL G. GARDEPHE</u>**[*]

13cv4185-PGG-FM

**FRANK MAAS**, United States Magistrate Judge.

       <u>Pro se</u> plaintiff Walter Singleton ("Singleton") brings this action pursuant to

Section 205(g) of the Social Security Act ("Act"), as amended, 42 U.S.C. § 405(g),

seeking review of a final decision of the Commissioner ("Commissioner") of the Social

Security Administration ("SSA") denying his application for Disability Insurance

Benefits ("DIB") and Supplemental Security Income ("SSI").  The Commissioner has

moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure.  (ECF No. 19).  For the reasons set forth below, I recommend that the

Commissioner's motion be granted.

---

    [*]    Gregory A. Arutiunov, a student at the New York University School of Law,
provided substantial assistance in the preparation of this Report and Recommendation.

I.      Background

A.      Procedural Background

On September 21, 2011, Singleton filed applications for DIB and SSI, claiming that he was disabled as of December 31, 2009.  (See R. 76-84).[2]  After the Commissioner denied both applications initially on December 1, 2011,  (id. at 38-43), Singleton requested a de novo hearing before an Administrative Law Judge ("ALJ"), which was held before ALJ Michael Friedman ("ALJ Friedman") on May 24, 2012, (see id. at 23-34).  Thereafter, on June 25, 2012, the ALJ issued a written decision in which he concluded that Singleton was not disabled within the meaning of the Act and, therefore, denied his application for DIB and SSI.  (Id. 13-19).  The ALJ's decision became final on June 4, 2013, when the Appeals Council denied Singleton's request for review.  (Id. at 1-6).

On June 13, 2013, Singleton commenced this action challenging the Commissioner's decision.  (ECF No. 2).  After the Commissioner timely filed her motion on February 8, 2014, Singleton's opposition papers were due by March 7, 2014.  (ECF No. 17).  On October 22, 2014, seven months after his opposition was due, Singleton requested, and the Court granted, an extension of time to oppose the Commissioner's motion.  (ECF Nos. 24, 25).[3]  Thereafter, on November 10, 2014, Singleton submitted a

_____

        [2]      "R." refers to the certified copy of the administrative record filed by the Commissioner.  (ECF No. 13).

        [3]      In his request Singleton indicated that he had never received a copy of the
                                                                (continued...)

two-page affirmation, asserting, essentially, that he had reviewed the Commissioner's motion and disagreed with it.  (ECF No. 26 at 2).  Singleton also offered to provide new medical information from a doctor, Ricardo Dunner, whose telephone number he furnished.  (Id.).[4]

    B.    Factual Background[5]

        1.    Non-Medical Evidence

Singleton was born on July 28, 1978, making him thirty-four years old when he applied for disability benefits.  (R. 76).  At that time, Singleton shared an apartment in Manhattan with his family.  (Id. at 116).  He also reported that he had stopped working because of his "condition(s)."  (Id. at 107).  Although he did not graduate from high school, he received a GED in 2011.  (Id. at 108).

At the hearing before ALJ Friedman, Singleton testified without the assistance of an attorney or other representative.  (Id. at 25).  Singleton described his most

---

[3](...continued)
Commissioner's motion because he had changed addresses around the time that the Commissioner's motion was sent to him.  (ECF No. 24).  Consequently, I directed the Commissioner to provide Singleton with a copy of the motion papers and extended Singleton's time to oppose the motion to November 17, 2014.  (ECF No. 25).

[4]    A Google search indicates that Dr. Dunner is affiliated with the medical program at "NarcoFreedom."  There is no indication that Dr. Dunner treated Singleton during the relevant time period, nor is there any reference to the program in the papers that Singleton submitted to the SSA in connection with his application, or those that the ALJ obtained from Singleton's medical providers.

[5]    I recite only those facts relevant to this Report and Recommendation.  The administrative record sets forth Singleton's medical history more fully.

recent occupation as "environmental mediation technician," explaining that he had worked as a "HAZMAT supervisor."  (Id. at 26).  In that capacity, Singleton aided in the removal of asbestos and other hazardous chemicals.  (Id. at 126).  Although he indicated in his benefits application that he was unable to work because of disability, (id. at 76), Singleton acknowledged in his testimony that he recently had begun working at Walgreens as a "greeter."  (Id. at 29).

Singleton testified that his health took a turn for the worse during his most recent assignment as a HAZMAT supervisor.  (Id. at 26).  At that time, he was "rushed" to the hospital due to a swollen right ankle.  Subsequently, at the recommendation of his doctor, Singleton treated the ankle pain with Aleve pills, which damaged his kidneys, resulting in renal insufficiency.  (Id.).  Ultimately, he "[l]ost [his] job" as a result of ankle swelling and pain.  (Id. at 148).  Further, because of his kidney problems, Singleton was no longer able to take pain medication to alleviate his persistent ankle pain.  (Id. at 28). During his testimony, Singleton also reported that he suffered from high blood pressure, occasional chest pain, shortness of breath, and drowsiness.  (Id. at 27-30).  Elsewhere, Singleton reported problems sleeping.  (Id. at 135, 138).

When he was asked about his current physical capabilities, Singleton testified that he was capable of lifting a five to ten pound grocery bag, standing for approximately fifteen minutes, sitting for extensive periods of time, walking for approximately thirty minutes, and assisting with shopping, cleaning, laundry, and cooking,  (Id. at 30-31, 118-19).  Similarly, in a function report dated October 5, 2011,

Singleton reported that he was capable of using public transportation, standing for up to forty minutes, and walking for up to thirty minutes.  (Id. at 121-22).

       2.    <u>Medical Evidence</u>

          a.    <u>Treatment Records</u>

The administrative record contains Singleton's treatment records from Mount Sinai Medical Center, (id. at 151-74), Beth Israel Medical Center, (id. at 175-91), and Bellevue Hospital Center, (id. at 192-203).  While these records primarily focus on the treatment of Singleton's hypertension, they also address Singleton's chest pain and sleep apnea.

On July 31, 2010, Singleton underwent a battery of cardiovascular tests at Mount Sinai Hospital after reporting to the emergency room with chest pain.  (Id. at 162-63, 165, 167).  On August 2, Dr. Mark Harrison of Mount Sinai examined Singleton and reviewed the results of those tests.  (Id. at 154-56).  Singleton reported to Dr. Harrison that his chest pain, which had started ten days earlier, was "[s]harp on [his] left side," and "highly unpredictable."  (Id. at 154).  Dr. Harrison found Singleton's chest x-ray to be "unremarkable."  (Id.).  Dr. Harrison's physical examination of Singleton similarly confirmed that he was not in any acute distress and presented with no respiratory or cardiovascular problems.  (Id. at 155-56).  Dr. Harrison's assessment was that Singleton had a history of hypertension and tobacco use, and presented with chest pain.  He also noted that Singleton's electrocardiogram showed left ventricular hypertrophy ("LVH").  (Id. at 157).  As a result, Singleton's hypertension medications were changed.  (Id.).

Several days later, on August 4, 2010, Singleton was admitted to the Beth Israel Medical Center with renewed complaints of chest pain radiating to his left arm. (Id. at 186).  An exercise electrocardiogram produced no evidence of myocardial ischemia, although Singleton had a hypertensive response to exercise.  (Id. at 177).   A report by Dr. Joseph Broudy, a radiology resident, noted that Singleton's cardiomediastinal silhouette was unremarkable and that his lungs were clear.  (Id. at 188). The resident's impression was that Singleton's chest was "normal."  (Id. at 191).  Upon discharge after a four-day hospital stay, Singleton was given a primary diagnosis of non-cardiac chest pain, and secondary diagnoses of hypertension, chronic kidney disease, tobacco and alcohol use, and obesity.  (Id. at 176).

On March 19, 2011, Singleton was seen at Bellevue Hospital for abnormal blood pressure, and was diagnosed with asymptomatic hypertension.  (Id. at 199).  He stated that he had stopped taking his prescribed medication and was taking an herbal supplement instead.  (Id.).  At discharge, he was instructed to take his prescribed medication.  (Id.).  Singleton had a similar incident and was given similar discharge instructions in mid-June 2011.  (Id. at 201-02).

Singleton was admitted to Bellevue Hospital on August 14, 2011.  (Id. at 193-98, 204-09).  He complained of chest pain, reported being noncompliant with his medications, and, upon admission, was given nitroglycerin.  (Id. at 195, 197, 204-05). Dr. Sarah Moore, the attending physician, diagnosed Singleton with chest pain not otherwise specified and referred him to a hypertension clinic after discharge.  (Id. at 205).

6

Dr. Moore also indicated a secondary diagnosis of chronic kidney disease unspecified. (Id. at 193).  On September 19, Singleton was seen at Bellevue's hypertension clinic.  He was diagnosed with hypertension and his medications were adjusted.  (Id. at 222).

On September 7, 2011, Singleton was evaluated by the Federal Employment and Guidance Services ("FEGS"), apparently in an effort to determine which of his conditions could be improved through rehabilitation.  (See id. at 223-57).  As part of his history, Singleton claimed to have been treated at Bellevue one year earlier for a mild heart attack.  (Id. at 242).[6]  His physical examination was largely unremarkable, although his blood pressure was 170/110.  (Id. at 228).  The FEGS diagnosis was essential hypertension, hypertensive heart, and chronic kidney disease.  (Id.).  FEGS developed a Wellness Plan that called for the agency to monitor his compliance and progress with his medical treatment.  (Id. at 253).

On November 30, 2011, Singleton was evaluated at the New York University Sleep Disorder Center.  (Id. at 270-71).  The evaluation by Drs. Andrew Varga and Nishay Chikara revealed that Singleton suffered from mild obstructive sleep apnea. (Id. at 270).  The doctors noted, however, that Singleton responded well to a continuous positive airway pressure machine ("CPAP").  Drs. Varga and Chikara recommended that Singleton begin using a CPAP, pursue weight loss, and "avoid driving or other critical tasks requiring sustained vigilance" until his daytime somnolence resolved.  (Id. at 270-71).

---

[6]       There is no evidence of such a heart attack in the record before this Court.

7

On February 2, 2012, Dr. Varun Verma of Bellevue Hospital completed a
Treating Physician's Wellness Plan Report for the New York City Human Resources
Administration.  (Id. at 293-94).  Dr. Verma diagnosed Singleton with hypertension and
chest pains.  (Id. at 293).  Dr. Verma noted that Singleton had a normal physical exam,
stress test, and electrocardiogram ("EKG").  (Id.).  Dr. Verma further noted that Singleton
was taking prescribed medication and was compliant with his other types of treatment.
(Id.).  Dr. Verma reported that Singleton continued to have "severe chest pain . . . on
exertion," as well as "severe high blood pressure," for which he was taking three
medications.  (Id.).  Dr. Verma indicated that Singleton presented an "unclear etiology of
symptoms."  (Id. at 294).  Based on a physical examination and a chart review, Dr. Verma
assessed Singleton's functional capacity as "[e]mployable with work limitations,"
including "no heavy lifting," "no manual labor," and "no tasks that require [him to be] on
his feet or constantly moving [or] walking."  (Id.).

On April 10, 2012, Dr. Jennifer Knishinsky of Bellevue Hospital wrote a
"To Whom it May Concern" letter in which she noted that Singleton had "chronic right
ankle pain" and "swelling secondary to multiple injuries to the ankle over time."  (Id. at
292).  Dr. Knishinsky recommended that Singleton not perform "any work involving
heavy lifting, manual labor, or long periods of standing or walking," to prevent further
injuring his ankle.  (Id.).  On June 8, Singleton went to Bellevue and was diagnosed with
right ankle and foot pain.  (Id. at 299).  A nurse practitioner recommended two days of
bed rest.  (Id. at 298-99).  The following week, on June 14, 2012, Dr. Verma prepared a

note in which he stated that Singleton was "not able to bear weight on the RIGHT side without excruciating pain."  (Id. at 297) (capitalization in original).  Dr. Verma indicated that for approximately four to six weeks, Singleton therefore would be "unable to perform any job which requires him to stand for more [than] 15 minutes" for approximately 4-6 weeks."  (Id.).[7]

           b.      Consultative Examinations

           i.      Dr. Susie Chow

On October 26, 2011, Dr. Susie Chow of Industrial Medical Associates ("IMA") conducted an internal medicine examination of Singleton.  (See id. at 257-62).  Dr. Chow described Singleton's chief medical complaints as chest pain and right ankle pain.  (Id. at 257).  She also discussed at some length Singleton's medical history, noting that it included high blood pressure, renal insufficiency, asthma, and chest pain.  (Id. at 257-58).  She also noted that Singleton reported having had a minor "heart attack" in 2010.  (Id. at 257; see supra at 7, n.5).

Dr. Chow reported that Singleton engaged in "cooking, cleaning, laundry, and shopping," and also was "able to shower, bathe, and dress himself."  (Id. at 258).  Upon examination she concluded that Singleton was in "no acute distress," although he walked with a "slight limp . . . [on his] right leg because of the ankle pain."  (Id. at 259).  She similarly observed that Singleton walked on his "heels and toes with great difficulty

---

[7]      The Commissioner suggests, but the record does not appear to establish, that the nurse practitioner's recommendation and Dr. Verma's note were first submitted to the SSA after the ALJ issued his decision.  (See ECF No. 20 at 8).

because of . . . right ankle pain." (Id.).  Dr. Chow noted that Singleton's right ankle had

"mild swelling over the medial aspect." (Id. at 260).  Dr. Chow also noted that

Singleton's last asthma attack was two to three years earlier.  (Id. at 258).

Dr. Chow diagnosed Singleton with chest pain, a history of myocardial

infarction, right ankle pain, hypertension, a history of asthma, renal insufficiency, and

active tobacco and alcohol use.  (Id. at 260).  Dr. Chow determined that Singleton's

prognosis was "[f]air," finding that he had "mild limitations to prolonged standing,

walking, and climbing stairs" due to his cardiac impairments, and "moderate restrictions

to lifting and carrying." (Id. at 260-61).

### ii.   Dr. Lawrence S. Liebman

On November 21, 2011, Dr. Lawrence S. Liebman, a board-certified

radiologist at IMA, reviewed an x-ray of Singleton's right ankle.  (Id. at 263).  Dr.

Liebman found that there was "no evidence of acute fracture, dislocation or destructive

bony lesion," and that the "joint spaces [were] relatively well maintained." (Id.).[8]

### c.   Other Medical Reports

The record also includes a second Treating Physician's Wellness Plan

Report dated December 1, 2011.  (See id. at 280-81).  Although this two-page report

includes the physician stamp of Dr. Sarika Modi, (id. at 281), it appears to have been

---

[8]         The record further contains a Physical Residual Functional Capacity Assessment
by a state disability analyst.  (R. 264-69).  I have not summarized that document since the ALJ
(correctly) did not rely on it at all.  See Martin v. Astrue, No. 7:10-CV-113 (TJM), 2012 WL
4107818, at *15 (N.D.N.Y. Sept. 19, 2912).

completed and signed by somebody else.  (Id.).[9]  By checking a box, the reporting

physician indicated that Singleton's functional capacity was "[t]emporarily

unemployable," but gave no reasons for this assessment.  (Id.).  The reporter also

indicated that the assessment was based upon a review of Singleton's chart and

unspecified reports from a specialist, not a physical examination.  (Id.).

II.     Applicable Law

A.     Standard of Review

Under Rule 12(c) of the Federal Rules of Civil Procedure, judgment on the

pleadings is appropriate when the material facts are undisputed and a party is entitled to

judgment as a matter of law based on the contents of the pleadings.  See, e.g., Sellers v.

M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988); Carballo ex rel. Cortes v.

Apfel, 34 F. Supp. 2d 208, 213-14 (S.D.N.Y. 1999).

The Act, in turn, provides that "[t]he findings of the Commissioner of

Social Security as to any fact, if supported by substantial evidence, shall be conclusive."

42 U.S.C. § 405(g); see Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Perez v.

Chater, 77 F.3d 41, 46 (2d Cir. 1996).  The term "substantial" does not require that the

evidence be overwhelming, but it must be "more than a mere scintilla.  It means such

relevant evidence as a reasonable mind might accept as adequate to support a

---

[9]     The report is signed by an individual whose printed first name begins with an
"M," and whose printed last name resembles "Meneces."  A physician license number is set
forth, but an online search of the New York State Office of the Professions database,
(www.op.nysed.gov/opsearches.htm), unearthed no physician currently registered under that
number.

conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

A district court is not permitted to review the Commissioner's decision de novo. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998)); Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991). Rather, the court's inquiry is limited to ensuring that the Commissioner applied the correct legal standard and that his decision is supported by substantial evidence. See Hickson v. Astrue, No. 09 Civ. 2049 (DLI) (JMA), 2011 WL 1099484, at *2 (E.D.N.Y. Mar. 22, 2011). When the Commissioner's determination is supported by substantial evidence, the decision must be upheld, "even if there also is substantial evidence for the plaintiff's position." Morillo v. Apfel, 150 F. Supp. 2d 540, 545 (S.D.N.Y. 2001). This means that the ALJ's factual findings may be set aside only if a reasonable factfinder would have had to conclude otherwise. Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012).

B.   Disability Determination

The term "disability" is defined in the Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "[W]hether a claimant is disabled or unable to work is a matter reserved for the Commissioner." Rodriguez v. Astrue, No. 02 Civ. 1488 (BSJ) (FM), 2009 WL

1619637, at *16 (S.D.N.Y. May 15, 2009) (citing 20 C.F.R. § 404.1527).  In determining

whether a claimant is disabled, the Commissioner is required to apply the five-step

sequential process set forth in 20 C.F.R. §§ 404.1520 and 416.920.

> The Second Circuit has described this familiar process as follows:
>
> First, the [Commissioner] considers whether the claimant is
> currently engaged in substantial gainful activity.  If he is not,
> the [Commissioner] next considers whether the claimant has a
> "severe impairment" which significantly limits his physical or
> mental ability to do basic work activities.  If the claimant
> suffers such an impairment, the third inquiry is whether,
> based solely on medical evidence, the claimant has an
> impairment which is listed in Appendix 1 of the regulations.
> If the claimant has such an impairment, the [Commissioner]
> will consider his disabled without considering vocational
> factors such as age, education, and work experience. . . .
> Assuming the claimant does not have a listed impairment, the
> fourth inquiry is whether, despite the claimant's severe
> impairment, he has the residual functional capacity to perform
> his past work.  Finally, if the claimant is unable to perform his
> past work, the [Commissioner] then determines whether there
> is other work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d

464, 467 (2d Cir. 1982)); accord Burgess v. Astrue, 537 F.3d 117, 120 (2d Cir. 2008).

The claimant bears the burden of proof with respect to the first four steps.  DeChirico v.

Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998).  If the claimant sustains their burden at

each of these steps, then the burden shifts to the Commissioner at step five.  Poupore v.

Astrue, 566 F.3d 303, 306 (2d Cir. 2009).

In assessing whether a claimant has a disability, the factors to be considered

include:  "(1) the objective medical facts; (2) diagnoses or medical opinions based on

such facts; (3) subjective evidence of pain or disability testified to by the claimant or other[s]; and (4) the claimant's educational background, age, and work experience." Rivera v. Harris, 623 F.2d 212, 216 (2d Cir. 1980).  When reviewing the medical evidence, the ALJ has the authority to select among conflicting opinions.  Veino, 312 F.3d at 588; see also Richardson, 402 U.S. at 399.  Thus, if there are genuine conflicts within the evidence, their resolution is a matter committed to the Commissioner's discretion.  See Dwyer v. Astrue, 800 F. Supp. 2d 542, 550 (S.D.N.Y. 2011) (citing Veino, 312 F.3d at 588).

III.     ALJ Decision

        In his decision, the ALJ determined at Step One that Singleton had not engaged in substantial gainful activity since December 31, 2009, his alleged onset date. (R. 15).  At Step Two, the ALJ found that Singleton's hypertension and osteoarthritis were severe impairments, but that his asthma, renal insufficiency, and sleep apnea were not.  (Id.).  At Step Three, the ALJ further found that Singleton's severe impairments did not meet or medically equal the severity of the impairments ("Listings") in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1").  (Id. at 16).  At Step Four, the ALJ determined that Singleton could not perform his past relevant work as an environmental inspector, but had the RFC to perform the full range of sedentary work.  (Id. at 16-18). Finally, at Step Five, the ALJ applied the Medical-Vocational Guidelines (commonly known as the "Grids"), which he concluded required a finding that Singleton was not disabled.  (Id. at 18).

14

IV.     Discussion

To be entitled to DIB, Singleton must establish disability prior to his date last insured.  Arone v. Bowen, 882 F.2d 34, 37-38 (2d Cir. 1989).  Here, that date is December 31, 2010.  (R. 103).  SSI benefits, however, are available without regard to a claimant's employment history.  See Casson v. Astrue, No. 5:10-CV-01537 (LEK/ATB), 2012 WL 28300, at *1 (N.D.N.Y. Jan. 5, 2012).  Thus, the question before the Court is whether the ALJ's determination that Singleton was not disabled within the meaning of the Act between December 31, 2009 (his alleged onset date), and June 25, 2012 (when the ALJ issued his decision), is legally correct and supported by substantial evidence.

Singleton's form Complaint contains the boilerplate allegation that the ALJ's decision was "erroneous, not supported by substantial evidence in the record, and/or contrary to law."  (ECF No. 2 at 2).  Singleton's two-page opposition to the Commissioner's motion similarly states in a conclusory manner that his "medical conditions are serious" and that he disagrees with the Commissioner's motion.  (ECF No. 26).  As set forth below, notwithstanding these assertions, it is clear that the ALJ proceeded properly and that his decision is supported by substantial evidence.

A.     Duty to Develop the Record

"Before determining whether the Commissioner's conclusions are supported by substantial evidence, . . . [a court] must first be satisfied that the claimant has had a full hearing under the regulations and in accordance with the beneficent purposes of the Social Security Act."  Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009)

15

(internal quotation marks, ellipsis, and brackets omitted).  This requires the Court to consider whether the ALJ adequately developed the record.  Id. at 114-15.  When the record evidence is inadequate to determine whether an individual is disabled, the ALJ must contact the claimant's medical sources to gather additional information.  Schaal, 134 F.3d at 505; Hilsdorf v. Comm'r of Soc. Sec., 724 F. Supp. 2d 330, 344 (E.D.N.Y. 2010) (citing 20 C.F.R. § 404.1512(e), (e)(1)).  The ALJ may do this by requesting copies of the claimant's medical source's records, a new report, or a more detailed report from the medical source.  Jimenez v. Colvin, No. 11 Civ. 4599 (DRH), 2013 WL 1332630, at *8 (E.D.N.Y. Mar. 31, 2013).  The duty to develop the record fully is heightened when a claimant is proceeding pro se.  Moran, 569 F.3d at 113.

ALJ Friedman satisfied his duty to develop the administrative record by inquiring into Singleton's medical and work history during the hearing, as well as by securing the relevant medical records from Beth Israel, Mount Sinai, and Bellevue Hospitals, the three facilities that Singleton identified as having provided medical services to him.  (See R. 110-112, 151-74, 175-91, 192-203, 287-312).  Although Singleton since has indicated to the Court that Dr. Dunner may have relevant information, (see ECF No. 26 at 2), he never brought that to the attention of the Commissioner, nor is there anything in the records that the ALJ did obtain that would have alerted him that there were additional records that should be sought.  There also is no suggestion that Dr. Dunner's records would relate to the relevant time period and not be cumulative.  Accordingly, it appears that the ALJ fulfilled his duty to develop the record as best he could.

B.    <u>Disability Analysis</u>

As noted previously, ALJ Friedman analyzed Singleton's disability claim using the mandated sequential evaluation process.  Accordingly, the Court need only review those steps where the ALJ made findings that arguably could be considered adverse to Singleton.

1.    <u>Step Two</u>

The second step of the sequential analysis requires the ALJ to assess the medical severity of a claimant's impairments.  20 C.F.R. § 404.1520(a)(4)(ii).  An impairment is severe if it significantly limits the claimant's physical or mental ability to perform basic work activities.  <u>Id.</u> § 404.1520(c).  The ALJ does not consider the claimant's age, education, or work experience at this step.  <u>Id.</u>

Because Step Two merely serves as a filter to screen out <u>de minimis</u> disability claims, a finding of any severe impairment, whether attributable to a single condition or a combination of conditions, is enough to satisfy its requirements.  <u>Fortier v. Astrue</u>, No. 3:10 Civ. 01688 (MRK) (WIG), 2012 WL 3727178, at *9 (D. Conn. May 11, 2012) (quoting <u>Jamison v. Bowen</u>, 814 F.2d 585, 588 (11th Cir. 1987)).

Here, ALJ Friedman found that Singleton's hypertension and osteoarthritis constituted severe impairments.  (R. 15).  On the other hand, the ALJ determined that Singleton's asthma, renal insufficiency, and mild obstructive sleep apnea, were not severe impairments.  (Id.).  Because the ALJ found at least one severe impairment, the ALJ correctly proceeded to Step Three of the analysis.

2.      Step Three

The third step of the sequential analysis requires the ALJ to determine whether the claimant has an impairment or combination of impairments that meets or medically equals the Listings.  See 20 C.F.R. § 404.1520(a)(4)(iii).  The ALJ must base this decision solely on medical evidence, without regard to the claimant's age, education, or work experience.  Id. § 404.1520(d).  If the ALJ finds that the claimant has an impairment that meets or medically equals a Listing, the claimant is considered disabled within the meaning of the Act.  Id. §§ 404.1520(a)(4)(iii), (d).  If the claimant's impairment does not meet the criteria for any listed impairment, the ALJ must proceed to the next step of the analysis.  Id. § 404.1520(e).

In his decision, ALJ Friedman found that Singleton did not have an impairment or combination of impairments that met or medically equaled any of the Listings in Appendix 1.  In reaching this conclusion, the ALJ considered Listing 1.02(A), pertaining to "major dysfunction" of a "major peripheral weight-bearing joint . . . resulting in inability to ambulate effectively."  See Appendix 1 § 1.02(A); (R. 16).  ALJ Friedman concluded that Singleton's right ankle osteoarthritis did not meet or medically equal that listing because the record lacked any medical evidence that his impairment "result[ed] in [an] inability to ambulate effectively."  (Id.).  This determination is supported by substantial evidence.

The Listings define the "inability to ambulate effectively" as an "extreme limitation of the ability to walk," generally associated with the inability to ambulate

18

independently "without the use of a hand-held assistive device(s)."  Appendix 1
§ 1.00(B)(2)(b)(1).  The Listings further provide that "[t]o ambulate effectively,
individuals must be capable of sustaining a reasonable walking pace over a sufficient
distance to be able to carry out activities of daily living," such as "walking a block at a
reasonable pace . . . [and] us[ing] standard public transportation . . . ."  Id.
§ 1.00(B)(2)(b)(2).  Singleton testified that he could walk for approximately one-half hour
and could comfortably stand for about fifteen minutes.  (Id. at 30-31).  Additionally, he
indicated that he was able to utilize public transportation, assist with grocery shopping,
and walk five to ten blocks without having to stop and rest.  (Id. at 30-31, 119, 123).  This
uncontradicted evidence was more than sufficient for the ALJ to conclude that Singleton
could ambulate effectively.

In his decision, the ALJ failed to address whether any of Singleton's other
impairments met or medically equaled the severity of the Listings.  That, however, does
not necessitate a remand.  As the Second Circuit has made clear, an ALJ need not spell
out his analysis in great detail, so long as the Court can clearly discern that there is
substantial evidence in the record to support his conclusion.  See Salmini v. Comm'r of
Soc. Sec., 371 F. App'x 109, 112 (2d Cir. 2010) (citing Berry, 675 F.2d at 469);  Batista
ex rel. M.B. v. Astrue, No. 08-CV-2136 (DLI), 2010 WL 3924684, at *7-9 (E.D.N.Y.
Sept. 29, 2010).  Here, the only other impairments that Singleton conceivably might have
contended were severe were his hypertension and chronic kidney disease.  Neither of
these conditions, however, met or medically equaled the requirements of the Listings.

19

Listing § 4.00(h)(1) relates to hypertension.  That Listing states that because hypertension "generally causes disability through its effects on other body systems," the Commissioner will evaluate the condition "by reference to the specific body systems affected."  Appendix 1 § 400(h)(1).  Here, there is no evidence that Singleton's hypertension effected or impaired any other bodily systems to such an extent as to meet or medically equal the hypertension Listing.  See Rosado v. Astrue, 713 F. Supp. 2d 347, 362 (S.D.N.Y. 2010) (collecting cases); Garner v. Astrue, 08 Civ. 6367 (AJP), 2009 WL 903742 at *17 (S.D.N.Y. Apr. 6, 2009), report & rec. adopted in part, 2009 WL 1911744 (S.D.N.Y. Jun. 30, 2009) (hypertension fails to satisfy Listing if it does not "produce any effects (primary or secondary) that severely impaired other bodily systems") (emphasis added).

Singleton's renal insufficiency similarly did not meet or medically equal the criteria of Listing 6.02, which relates to impairments of renal function.  At the time of the hearing, this Listing required chronic renal disease that had lasted or could be expected to last for twelve continuous months, plus either ongoing dialysis, kidney transplantation, or persistent creatinine levels of four milligrams or more per deciliter.  See Appendix 1 §§ 6.00(E)(1), 6.02(A)-(C) (2012).[10]  The record does not support any of these additional

---

[10]     Under the current Listings, the relevant provision would be Listing 6.05 relating to chronic kidney disease with impairment of kidney function.  See Appendix 1 § 6.05 (2015).  That Listing also requires a creatinine level of four milligrams or more, or a creatine clearance of twenty milliliters per minute or less, or an estimated glomerular filtration rate of twenty milliliters per minute or less.  Id. §§ 6.05(A)(1)-(3) (2015).  The record does not suggest that Singleton meets any of these requirements.

required showings.  Indeed, Singleton's highest documented creatinine level appears to have been 1.7 in August 2011.  (R. 249).

        3.     <u>Step Four</u>

At Step Four, the ALJ is required to determine the claimant's RFC, or the functions the claimant is able to perform despite his impairments, while considering the relevant evidence from the case record.  20 C.F.R. §§ 404.1524(a)(1), (3). The ALJ's RFC analysis must "[s]et forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work."  SSR 96-9p, 1996 WL 374184, at *7 (July 2, 1996).

The analysis at this step involves a two-part inquiry.  First, the ALJ must consider whether the claimant has a medically-determinable impairment that could reasonably be expected to produce the pain or symptoms alleged by the claimant. <u>Sarchese v. Barnhart</u>, No. 01 Civ. 2172 (JG), 2002 WL 1732802, at *7 (E.D.N.Y. July 19, 2002) (citing SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996)); 20 C.F.R. §§ 404.1529(b), 416.929(b).  Then, if the claimant makes statements about his symptoms that are not substantiated by objective medical evidence, the ALJ must make a finding as to the claimant's credibility and determine the extent to which his symptoms truly limit his ability to perform basic work activities.  <u>Sarchese</u>, 2002 WL 1732802, at *7; SSR 96-7p, 1996 WL 374186, at *1.  A federal court must afford great deference to the ALJ's credibility finding so long as it is supported by substantial evidence.  <u>Bischof v. Apfel</u>, 65 F. Supp. 2d 140, 147 (E.D.N.Y. 1999); <u>see also</u> <u>Gernavage v. Shalala</u>, 882 F.

21

Supp. 1413, 1419 n.6 (S.D.N.Y. 1995) ("Deference should be accorded [to] the ALJ's determination [as to claimant's credibility] because [he] heard [claimant's] testimony and observed [his] demeanor.").

> The Regulations define "sedentary work" as follows:
>
> [Sedentary work involves] lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."

20 C.F.R. § 416.967.  In his decision, ALJ Friedman determined that Singleton had the RFC to "perform the full range of sedentary work" because he could "lift and carry up to ten pounds occasionally," "stand or walk for about two hours," and "sit for about six hours during an eight-hour workday."  (R. 16).

In reaching this conclusion, the ALJ determined that although Singleton's impairments could reasonably be expected to cause his alleged symptoms, his statements concerning the intensity, persistence, and limiting effects of his symptoms were "not credible to the extent they [were] inconsistent . . .  with" the ALJ's RFC determination. (Id.). The use of this boilerplate language has repeatedly been criticized by the courts. See, e.g., Bjornson v. Astrue, 671 F.3d 640, 645 (7th Cir. 2012) (characterizing it as "even worse" than earlier template language widely used by ALJs).  Indeed, it puts the credibility determination after the RFC determination, which "gets things backwards." Ramos v. Comm'r of Soc. Sec., No. 13-cv-6561 (AJN), 2015 WL 708546, at *20

(S.D.N.Y. Feb. 4, 2015) (quoting <u>Bjornson</u>, 671 F.3d at 656).  Nevertheless, the evidence in support of the ALJ's credibility analysis is overwhelming.

ALJ Friedman indicated that he gave "significant weight" to the opinions of Dr. Verma, one of Singleton's treating physicians, and Dr. Chow, who performed a consultative exam.  (R. 17).  The opinions of both doctors were consistent with the ALJ's RFC determination, as well as his determination that Singleton's subjective complaints were not credible to the extent they suggested he could not perform any work.  For example, Dr. Verma indicated that Singleton should avoid heavy lifting and prolonged walking, two limitations specifically addressed by the ALJ's determination that Singleton could perform only sedentary work.  (<u>Id.</u> at 294).  Similarly, Dr. Chow stated that Singleton had only mild limitations with respect to prolonged standing, walking, and climbing stairs.  (<u>Id.</u> at 260).  These limitations also do not conflict with the ALJ's RFC determination.

In fact, even Singleton's own testimony lends support to the ALJ's findings.  For example, Singleton testified that he was able to walk for approximately thirty minutes, stand for "about [fifteen] minutes," and lift a grocery bag weighing five to ten pounds.  (<u>Id.</u> at 30-31).  Singleton testified further that he was able to assist his family with grocery shopping and cooking.  (<u>Id.</u> at 31).  This testimony was consistent with a Function Report that Singleton had prepared on October 6, 2011.  In that report, Singleton conceded that he had the capacity to stand for up to forty minutes, and to walk for up to thirty minutes, even though he also represented that "sitting is all I can do."  (<u>Id.</u> at 121).

Indeed, at the time of the hearing, Singleton was in his second week of work as a "greeter" at Walgreens, a job which involved extensive standing. (Id. at 29-30). Although Singleton indicated that fulfilling the standing component of the job was difficult, (id. at 30), his ability to perform a job requiring constant standing establishes that he retained the capacity to undertake work that required only a limited amount of standing.

After the hearing, Singleton submitted a note to the Appeals Council, dated June 14, 2012, in which Dr. Verma stated that Singleton would be unable to stand for more than fifteen minutes at a time for approximately four to six weeks. (Id. at 297). Even this restriction is consistent with the ALJ's prior determination that Singleton could perform sedentary work. See Butler v. Comm'r of Soc. Sec., No. 12 Civ. 9179 (KBF), 2013 WL 6053497, at *6 (S.D.N.Y. Nov. 8, 2013) (claimant properly deemed to be able to perform sedentary work since she had functional capacity to sit for two hours, stand for fifteen to thirty minutes, and walk for fifteen minutes). Moreover, to be considered disabled, Singleton had to establish that his impairment could be expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A). Here, the subsequent note, at best, indicated that Singleton had experienced a temporary exacerbation of his foot problem.

Finally, the record contains a "Treating Physician Wellness Report," attributed to Dr. Modi, which evaluated Singleton's functional capacity as "[t]emporarily unemployable." Although ALJ Friedman did not expressly consider or discuss this two-

page report, the ALJ's omission scarcely undercuts his determination, since it neither specifies a time period during which Singleton would be unemployable, nor sets forth an explanation as to why the doctor reached that conclusion.  Moreover, the report expressly indicates that it was completed without a physical examination, based solely on "[a] review of [Singleton's] chart" and a report from an unnamed specialist.  (See R. 280-81).

    4.   <u>Step Five</u>

At the fifth step, based on the claimant's age, education, work experience, and RFC, the ALJ must determine whether the claimant could "make an adjustment to other work."  20 C.F.R. § 404.1520(a)(4)(v).  As part of this analysis, the ALJ must determine whether there are jobs that the claimant could perform that exist in sufficient numbers in the national economy.  SSR 83-10, 1983 WL 31251, at *4 (1983).  In the "ordinary case" where a claimant has only exertional impairments, "the [ALJ] satisfies his burden by resorting to the [Grids]."[11]  <u>Bapp v. Bowen</u>, 802 F.2d 601, 604 (2d Cir. 1986); <u>see also</u> SSR 83-11, 1983 WL 31252, at *1 (1983) (Grids may be used to direct conclusion of "disabled" or "not disabled" only when the criteria of a rule are "exactly met.").

Here, in the absence of any evidence of significant non-exertional limitations, the ALJ properly relied on the Grids.  Singleton is a younger individual, (<u>i.e.</u>,

---

[11]    "Exertional limitations" are defined as "limitations and restrictions imposed by a [claimant's] impairment(s) and related symptoms" that affect the claimant's "ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)."  20 C.F.R. § 404.1569a(b).  "Nonexertional limitations" are defined as those that "affect only [the claimant's] ability to meet the demands of jobs other than the strength demands."  <u>Id.</u> § 404.1569a(c).

between the ages of eighteen and forty-four), who is English-speaking and a high school graduate. Although he has skills from his prior work they were not transferable to the sedentary jobs to which he was limited. Given this profile, the ALJ correctly applied Rule 201.28 of the Grids to conclude that he was not disabled.

V.      Conclusion

        For these reasons, the Commissioner's motion for judgment on the pleadings (ECF No. 19) should be granted.

VI.     Notice of Procedure for Filing of Objections to this Report and Recommendation

        The parties are hereby directed that if they have objections to this Report and Recommendation, they must, within fourteen days from today, make them in writing, file them with the Clerk of the Court, and send copies to the chambers of the Honorable Paul G. Gardephe at the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, N.Y. 10007, to my chambers at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, N.Y. 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Gardephe. The failure to file timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b); Thomas v. Arn, 474 U.S. 140 (1985); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992).

Dated:       New York, New York
             March 2, 2015

                                        _____
                                        FRANK MAAS
                                        United States Magistrate Judge

26

Copies to:

Defense Counsel via ECF

Walter Singleton via U.S. mail